**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

NetChoice,

Plaintiff,

vs.

Letitia James, in her official capacity as Attorney General of New York,

Defendant.

Case No. ________________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. For generations, there have been calls to restrict different kinds of constitutionally protected speech in the name of minors' safety. From dime novels and comic books to movies and television to music lyrics and video games, the types of purportedly harmful speech have varied, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797–98 (2011), but the constitutional limits on how states can act on those concerns have not: "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (quoting *Brown*, 564 U.S. at 790). Thus, when governments have tried to restrict access to such speech, courts held the constitutional line because even purportedly laudable ends cannot justify unconstitutional means.

2. Most recently, states have focused on social media services, seeking to impose a range of restrictions that would limit minors' access to and participation in what the Supreme Court has recognized are among "the most important places … for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Social media has become, for people of all ages, one of the "principal sources for knowing current events," for "speaking and listening[,]" and for "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107.

3. The First Amendment protects both the speech that users engage in on these services and those services' editorial judgment in selecting, organizing, and presenting that speech. *Moody*, 603 U.S. at 731. In making choices about what third-party speech to display and how to display it, those services decide what content to "include and exclude, organize and prioritize—and in making millions of those decisions each day, produce their own distinctive compilations of expression." *Id.* at 716. Laws curtailing those editorial choices "must meet the First Amendment's requirements. The principle does not change because the curated compilation has gone from the physical to the virtual world." *Id.* at 717. And although the State perhaps "has the power to *enforce* parental prohibitions[,]" it does not follow that it "has the power to prevent children from hearing or saying anything *without their parents' prior consent*" without confronting the First Amendment. *Brown*, 564 U.S. at 795 n.3 (emphasis in original).

4. Nevertheless, legislatures have also sought to restrict both minors' access to constitutionally protected speech online and platforms' ability to curate, publish, and disseminate that speech. As courts have recognized, those restrictions are subject to and fail First Amendment scrutiny, particularly where, as here, they are content-based and speaker-based.

5. Despite those constitutional limits and the cases enforcing them, New York has followed suit, enacting the Stop Addictive Feeds Exploitation (SAFE) For Kids Act (NY S 7694A) (the "Act"), ch. 120, § 3, 2024 N.Y. Laws, codified at N.Y. Gen. Bus. Law ("GBL") §§ 1500–1508. The Act regulates services that, as a "significant" part of their offerings, provide a personalized feed—that is, a feed that recommends third-party content to users on an individualized basis using information associated with that person.

6. The Act's restrictions and requirements fundamentally alter what expressive editorial choices the services may make in engaging with New York residents and how those users

may receive and engage with speech on those services. The Act prohibits presenting personalized feeds and restricts notifications about such feeds to covered minors absent verifiable parental consent. And it prohibits presenting a personalized feed to *any* user, of any age, unless the user has gone through an age-determination process. The Act does so notwithstanding the burden this places on all users, including adults who want to access protected speech without having to undergo age verification or risk ceding anonymity. And it does so notwithstanding that minors and their parents are already empowered—including through features already provided by the services themselves—to make choices about how best to access, or allow their children to access, the many benefits of the Internet. Instead, the State requires that parents make this determination through State-approved channels, when and how the State dictates. "Such laws do not enforce parental authority … ; they impose *governmental* authority, subject only to a parental veto," *Brown*, 564 U.S. at 795 n.3 (emphasis in original), and so must pass First Amendment scrutiny.

7. If allowed to stand, the Act will chill protected expressive activity by covered services and users alike. Faced with the prospect of substantial liability, services find themselves between a rock and a hard place, forced to make an unconstitutional choice between restricting their dissemination of fully protected speech in violation of their First Amendment rights on the one hand or risking enforcement and civil monetary penalties under the Act on the other.

8. In addition, 47 U.S.C. § 230 preempts the Act because its requirements would force regulated websites to fundamentally change how they publish user-generated content or face punishing liability. Section 230 preempts state laws that regulate "arranging and distributing third-party information" because those functions are "an essential result of publishing" that Section 230 protects. *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019). Section 230 therefore "bar[s] claims that 'attack the manner in which [a social media company's] algorithm sorts, arranges, and

distributes third-party content.'" *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 646 (9th Cir. 2025) (quoting *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 521, 523–27 (4th Cir. 2025)); *see Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1167–70 (9th Cir. 2026) (the "promotion of engagement-driven content through" a "personalized algorithm" is "publishing conduct" protected by Section 230). As courts have recognized, "acts of arranging and sorting content are integral to the function of publishing" and the fact that services "use[] an algorithm to achieve the same result … does not change the underlying nature of the act that it is performing." *Pinckney*, 127 F.4th at 526.

9. Facing imminent, irreparable harm, NetChoice seeks (a) a declaratory judgment that the Act, on its face and as applied to NetChoice's covered members and their services, violates the First and Fourteenth Amendments to the United States Constitution and is preempted by 47 U.S.C. § 230; (b) a preliminary and permanent injunction prohibiting Defendant from enforcing the Act against any NetChoice member; and (c) such further relief as the Court deems just and proper.

**PARTIES AND STANDING**

10. Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful. NetChoice's members are listed on its website. *See About Us*, NetChoice, https://perma.cc/L6DX-TQKH.

11. NetChoice has standing to bring its challenges on at least three grounds.

12. *First*, NetChoice has associational standing to challenge the Act on behalf of its members because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) the interests asserted are germane to NetChoice's purpose; and (3) members' individual

participation is not necessary for the claim asserted or the relief requested in this legal challenge to the Act's requirements. *See Defending Educ. v. Croton-Harmon Union Free Sch. Dist.*, 190 F.4th 53, 62 (2d Cir. 2026) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 803–05 (5th Cir. 2025).

13. Based on the Act's central coverage provisions and their implementing regulations, *e.g.*, GBL § 1500, the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic (Tumblr); (2) Google (YouTube); (3) Meta Platforms, Inc. ("Meta") (Facebook, Instagram, and Threads); (4) Pinterest; (5) Reddit; (6) SpaceXSI (X); and (7) TikTok Inc. and TikTok USDS Joint Venture LLC (TikTok). All of these members face enforcement risk under the Act.[1]

14. Although each member exercises unique judgments about how to organize and present third-party content (and, in some cases, to execute those judgments through algorithms), these judgments all incorporate "independent content standards" that "show up" through their feeds. *Moody*, 603 U.S. at 736 n.5. "[E]ach of those feeds presents a user with a continually updating stream of other users' posts" that is personalized for them. *Id.* at 734. Through those personalized feeds, the covered members disseminate vast amounts of protected speech and distinctive speech compilations to which the Act directly and unconstitutionally restricts access. Accordingly, any variation among NetChoice's covered members does not affect the standing analysis, and individual participation of each NetChoice member is not necessary to resolve the legal issues presented.

---

[1] Although the Act does not regulate all of NetChoice's members, this Complaint uses "members" to refer only to those NetChoice members whose services are regulated by the Act.

15. *Second*, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *See Virginia v. Am. Booksellers Ass'n*, *Inc.*, 484 U.S. 383, 392–93 (1988); *Fitch*, 134 F.4th at 806–07.

16. Covered users of covered websites face identical burdens under the Act, regardless of which website(s) they use. Thus, again, any variation among NetChoice's covered members does not affect the standing analysis, and individual participation of each NetChoice member is not necessary to resolve the legal issues presented.

17. *Third*, NetChoice has standing in its own right as a user of online services. NetChoice regularly uses many of the regulated websites, such as Instagram, X, and YouTube, to disseminate information about its advocacy activities and policy positions, and to educate the public—including teens and young adults—about First Amendment freedoms and other legal protections for online speech. The Act's restrictions will make it more difficult for NetChoice to disseminate that speech to users in New York, including minors who would otherwise encounter NetChoice's content through personalized feeds and notifications.

18. Defendant Letitia James is the Attorney General of New York. Defendant is a New York resident and is sued in her official capacity. The Attorney General has authority to enforce the Act. GBL § 1508.

## JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

20. Federal courts have the equitable power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

21. This Court has personal jurisdiction over Defendant because she resides in and conducts a substantial proportion of her official business in New York.

22. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant has a principal office in and thus resides in this District, and because injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in this District. Defendant James resides in this District for purposes of venue because the New York Attorney General's Office maintains one of its principal offices in this District. *See The People of the State of New York v. Austin*, No. 451533/2019, 2021 WL 325557, at *3 (N.Y. Sup. Ct. Jan. 29, 2021) (finding venue proper in New York County because "the Attorney General's principal office is located in Manhattan").

## BACKGROUND

### I. Social media services facilitate and create vast quantities of constitutionally protected and valuable speech.

23. As the Supreme Court has recognized, the "'vast democratic forums of the Internet'"—including "social media in particular"—provide some of "the most important places … for the exchange of views." *Packingham*, 582 U.S. at 104 (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). Those include social media services, which both facilitate "staggering" amounts of expression by third parties and "engage[] in expression" themselves through their "display" and "compiling and curating" of content "created by others."[2] *Moody*, 603 U.S. at 719,

[2] Given this, many courts have enjoined laws imposing expressive restrictions on social media services and their users. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1108–12, 1115–26 (9th Cir. 2024); *NetChoice v. Hilgers*, 840 F. Supp. 3d 777, 785, 790–97 (D. Neb. 2026), *appeal docketed*, No. 26-2478 (8th Cir.); *NetChoice v. Jones*, 822 F. Supp. 3d 656, 665–66, 669–79 (E.D. Va. 2026), *appeal docketed*, No. 26-1252 (4th Cir.); *NetChoice v. Griffin*, 831 F. Supp. 3d 816, 823–26, 828–35 (W.D. Ark. 2026) ("*Griffin II*"), *appeal docketed*, No. 26-1962 (8th Cir.); *NetChoice v. Murrill*, 812 F. Supp. 3d 594, 664 (M.D. La. 2025), *appeal docketed*, No. 26-30016 (5th Cir.); *NetChoice v. Griffin*, 812 F. Supp. 3d 905, 930 (W.D. Ark. 2025), *appeal docketed*, No. 26-1096 (8th Cir.); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1120–23, 1134 (D. Utah

728–32, 740. They engage in First Amendment activity on a massive scale, disseminating the resulting "distinct[] expressive offering" to billions of users worldwide, including users in New York. *Id.* at 734–35, 738.

24. People use those services "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno*, 521 U.S. at 870). Minors benefit from access to this vast array of content through curated experiences that can supplement their formal education, expose them to diverse viewpoints and experiences, foster intellectual curiosity and creativity, and help them participate in civic and cultural life. Through social media, teenagers can get recruited to play college sports, share their art or music, learn about schools or trades, or discuss politics, religion, or their favorite anime character. They may also use social media to find or build communities and connect with others with similar interests or experiences. For minors who are isolated or marginalized at home or at school, or want to connect with others who understand their experiences, these connections can be deeply meaningful. For example, a teen with a rare illness may not know anyone in real life managing the same issues, but can connect with others online to find a digital community to support them. A teen who wants to learn a language can connect with others who speak that language. And a teen who wants to sing in a choir can find a group online to perform with.

25. Both minors and adults alike use NetChoice members' websites to engage in speech that is entitled to First Amendment protection from governmental interference. "On Facebook, …

---

2024), *appeal docketed*, No. 24-4100 (10th Cir.); *NetChoice, LLC v. Griffin*, No. 5:23-cv-05105, 2025 WL 978607, at *7–10, *17 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-1889 (8th Cir.) ("*Griffin I*"). *But see Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 194 F.4th 144, 163 (11th Cir. 2026); *NetChoice, LLC v. Yost*, 180 F.4th 268, 288–93 (6th Cir. 2026); *NetChoice v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024) ("*Bonta I*"), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025).

users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to establish mutual connections with family and friends, post and view photos and videos (among other types of content), comment on them, make social connections, showcase creative talents, gather information about the world around them, learn and receive education, and participate in the democratic process. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104–05. On TikTok, people can discover things they love, build communities, and express themselves, consistent with the platform's mission to inspire creativity and bring joy. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. These websites all "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Id*. at 105, 107.

26. ***NetChoice members' covered websites disseminate and facilitate speech protected by the First Amendment.*** "Social media" websites—such as Plaintiff's members' covered services—"engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 728, 731, 740. Although the particular content on each NetChoice member's website may vary, members all aim to facilitate social interaction among users through the dissemination of protected speech on their services.

27. *Personalized feeds.* Given the sheer amount of content available online, it is impossible to display every piece of content to every user. It is also undesirable: even if a website could, not every piece of content is either something a website wants to show a particular user or

that that user wants to see. In general, covered websites organize combinations of both user-generated (third-party) content and speech they author. And because it is difficult to foster online communities without prioritizing the people and ideas a user is interested in, they display speech through "stream[s] of other users' posts"—"feeds" of content that are often "personalized" to each user. *Moody*, 603 U.S. at 734–35.

28. In so doing, each website makes expressive decisions about how to select, organize, display, and disseminate user-generated content. These include "a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint." *Id.* at 738. The resulting "feeds" combine "'multifarious voices' to create a distinctive expressive offering" in which the "individual messages may originate with third parties, but the larger offering is the platform's." *Id.* (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)). That whole has expressive value that transcends the sum of its parts.

29. Many member websites "personalize" these compilations through user-tailored "feeds" such as a "for you," "following," or "landing" page. Personalized feeds allow a user to see the content, activity, and other expression created and shared by family, friends, selected contributors, connections, and other third-party content creators. *See, e.g.*, *Moody*, 603 U.S. at 734; *see id.* ("Facebook delivers a personalized collection of [users'] stories" and "YouTube" provides "an individualized list of video recommendations"). Personalization is also how many covered websites provide minors with age-*appropriate* experiences (*e.g.*, by filtering out inappropriate or potentially harmful content). The curation and presentation of these feeds constitute "expressive activity," *id.* at 731, and the resulting offerings are personalized in a way that brings them within the Act's coverage. *See* GBL § 1500(1).

30. "The key" to creating such feeds is the "prioritization of content, achieved through the use of algorithms." *Moody*, 603 U.S. at 734. Indeed, many online services, including those operated by NetChoice members, use algorithms to automate the personalized recommendation of content for users. *See, e.g.*, *Personalization*, N.Y. Times, https://perma.cc/FH63-GRU5 (the New York Times uses personalization to "help [readers] discover The New York Times journalism and products that are most interesting" to them, by "personaliz[ing] aspects of [their] digital experience … based on [their] engagement on [the Times'] sites and apps, including what [someone] has already read, listened to or viewed"); *Personalization Features on Hulu*, Hulu, https://perma.cc/8VGR-H7ZN ("While you're looking for something to watch on Hulu, we'll recommend shows and movies that we think you might like.").

31. These algorithms reflect a multitude of ongoing human expressive judgments. These include judgments about whether to increase or decrease the prominence of particular types of content; how to identify content that might not be appropriate to recommend widely or repeatedly; how much new versus familiar content to present; how many new versus familiar speakers to present; and how to implement community guidelines and content policies. Websites also decide what type of feedback and signals from users to rely on in assessing the quality, presentation, and organization of content. These judgments are unique, dynamic, and iterative, and they reflect affirmative, ongoing efforts to present a distinctive expressive offering.

32. *Content-moderation judgments and personalized recommendations are fundamentally intertwined.* Some content-moderation judgments are categorical, and reflect across-the-board determinations that a service does not want to present a particular kind of content—like political discussions, for example—to any user. Others are not, and reflect more nuanced determinations about what is appropriate for particular users. Personalization allows

services to make not just the first kind of judgment, but also the second. And content-moderation judgments and personalized recommendations are executed through the same means: the same algorithms can implement a service's judgments about what content is appropriate for a particular user and what that user may find interesting. And the ultimate output—the curated feed of third-party content—will likewise reflect both judgments.

33. Importantly, NetChoice members do not use personalization algorithms to "respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Moody*, 603 U.S. at 736 n.5. Instead, they create expressive offerings by using algorithms that personalize content based on user activity *and* the services' own values and editorial judgments about what content is valuable and appropriate for that user—including by "*implement[ing]*" their *"[c]ommunity [s]tandards ... for example, to prefer content deemed particularly trustworthy*." *Id.* at 735 (emphasis added) (discussing Facebook's and YouTube's feeds).

34. In operating their services, therefore, NetChoice's members exercise ongoing editorial judgment about what content to display, prioritize, label, or exclude, and how to display it. Those editorial judgments result in distinct expressive services squarely protected by the First Amendment. *See id.* at 731. And those differing choices are why the same individual's personalized feeds will differ depending on whether they are on Facebook, X, TikTok, Bluesky, Reddit, or Gab. Such differences among publishers are commonplace: no two newspapers, cable channels, or book publishers are the same. But they all engage in the same fundamental activity, and they all are entitled to the same First Amendment protections for that activity.

35. At bottom, personalized feeds enable services to deliver a unique speech compilation to each user that implements services' own editorial judgments while taking into

account the basic truth that no one topic or type of content will be of equal interest to all. And they allow services to moderate content in a way that can contribute to an online community that is both vibrant and safe.

36. Furthermore, personalized feeds foster social connections and promote expression. In particular, personalized feeds foster a diversity of speech by helping connect individuals with the content that does interest them—and that might otherwise be lost in the sheer quantity of content available online. A user who likes country music might discover new up-and-coming artists she might not have found through a search, heard on the radio, or seen on TV. And that same up-and-coming artist benefits from her content appearing in the feeds of those likely to be interested, rather than drowned out in the sea of content. Users cannot search for a particular work or speaker they do not yet know exists. Personalized recommendations help them discover that content or creators and help speakers reach audiences they would otherwise miss. The end result is that more people have access to more content from more (and more diverse) sources.

37. *Notifications.* Many covered websites also provide users the option to receive notifications.

38. Notifications allow covered websites to facilitate communication and interaction among users by informing users about new messages, comments, content from connections, and recommendations, among other things. They also enable covered websites to communicate with users about other issues like problems with their accounts, fraud or spam alerts, and emergencies.

39. Notifications also facilitate users' awareness of information and content that might be relevant to them and their interests. Notifications can help them know when friends are marked safe, learn when a family member has messaged them about something important, and discover when a musician or artist they follow has posted new content. Apple News, Disney+, ESPN, Libby,

The New York Times, Fox News, and The Wall Street Journal, in addition to many other applications, send users notifications.[3] But those websites and applications are not covered by the Act.

40. Member websites that use notifications allow users to control those notifications.[4]

41. In addition to customizing notifications on the websites themselves, users can adjust notification settings for each application on their devices, including permitting them only during certain times of day or turning them off entirely. *See, e.g.*, *Use Notifications on your iPhone or iPad*, Apple, https://perma.cc/N5FV-MZEL; *see also Control App notifications on your Galaxy phone or tablet*, Samsung, https://perma.cc/Y3Q8-NKGK; *Control notifications on your Pixel Phone*, Google, https://perma.cc/G8TP-9YEF.

## II. There are many existing options for parental control and oversight.

42. Decisions about a minor child's online experience are often deeply personal, and what works for one family may not for another. They are also dynamic, with families making different decisions at different points in time that may not always follow a linear progression from more restricted to less restricted access. Parents can choose among many tools to regulate and

[3] *See, e.g.*, *Get News notifications and newsletters on iPhone*, Apple, https://perma.cc/JW7X-7MWD; *Push notifications on Disney+*, Disney+, https://perma.cc/MEV8-S9TE; *How do I sign up for Alerts?*, ESPN, https://perma.cc/6A7L-2GXY; *Managing notifications*, Libby, https://perma.cc/TW79-3QXN; *iOS News App*, N.Y. Times, https://perma.cc/VT5B-43QM; *How do I turn on Breaking News alerts?*, Fox, https://perma.cc/PY5X-XFUD; *Newsletter & Alerts*, Wall St. J., https://perma.cc/AX5F-MF4J.

[4] *See, e.g.*, *Choose what you get notifications for on Facebook*, Facebook, https://perma.cc/Z3WJ-VBQJ; *Notification Settings*, Instagram, https://perma.cc/A2WU-DECL; *Adjust your notification settings on Nextdoor*, Nextdoor, https://perma.cc/6XYP-3437; *Edit notification settings*, Pinterest, https://perma.cc/W2MX-PP2U; *Notifications*, TikTok, https://perma.cc/R35U-MKWV; *About notifications on mobile devices*, X, https://perma.cc/59JP-NLTE; *Manage YouTube notifications*, YouTube, https://perma.cc/L4C6-UVZ4.

oversee whether and how their minor children use the Internet, and these existing market solutions allow parents to tailor their approaches to the needs of their families.

43. In the first instance, parents can decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet.

44. Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, *Verizon Family*, Verizon, https://perma.cc/VTN3-S4EL; *AT&T Secure Family*, AT&T, https://perma.cc/7CHL-K8A6; *Family controls and privacy*, T-Mobile, https://perma.cc/R7MH-PG3J.

45. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, *Block and unblock websites with parental controls on Firefox*, Mozilla, https://perma.cc/P3YJ-L8DH. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See, e.g.*, *Choose parental controls that are right for your family*, Google, https://perma.cc/2DVC-YDWP. Parents can also use widely available browser extensions to reinforce these tools.

46. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, *How do I set up and install NETGEAR Smart Parental Controls?*, Netgear, https://perma.cc/T9KL-SQCQ.

47. Devices allow parents to limit the time their children spend on the device, block specific applications, filter content, and control privacy settings.[5]

---

[5] *See, e.g.*, *Set up parental controls to manage your child's iPhone or iPad*, Apple, https://perma.cc/5CEH-F9C2; *Help keep your family safer online*, Google, https://perma.cc/3TD8-4G2J; *Set up Microsoft Family Safety*, Microsoft, https://perma.cc/M3DJ-2FSC; *Manage Family groups and parental controls with your Samsung Account*, Samsung, https://perma.cc/4NED-X7HG; *Use Digital Wellbeing features on your Galaxy phone or tablet*, Samsung, https://perma.cc/MQ2L-ULLG; *Manage how you spend time on your Android phone with Digital Wellbeing*, Android, https://perma.cc/4GSD-H47U.

48. Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, James Capell, *Best parental control app of 2026: Our security experts and parents give their verdict*, TechRadar, https://perma.cc/2BMR-DNUW.

49. There are also resources that collect all these parental tools in one place. *See, e.g.*, *Parental controls guide*, Internet Matters, https://perma.cc/VFP3-K5W7; *Home page*, Childnet, https://perma.cc/92C4-5PM8.

50. **Parental tools provided by NetChoice members.** In addition, NetChoice members provide parents and minors with many tools and options to help ensure that minors are safely and responsibly using their services.

51. As an initial matter, services operated by NetChoice members, including Facebook, Instagram, and TikTok, prohibit minors under 13 from accessing their main services. Some members offer separate, highly restricted experiences for users under 13 geared for that age group. For example, YouTube offers YouTube Kids and a "Supervised Experience" for minors younger than 13, which allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

52. Meta places teens on Facebook, Instagram, and Threads into Teen Accounts. Teen Accounts have built-in protections that limit who can contact teens, the content they see, and the time they spend. For example, with Teen Accounts, teens are, by default, placed into: daily time limit notifications after they've spent 60 minutes on Instagram; Sleep Mode, which mutes notifications overnight and sends auto-replies if someone tries to DM them; private accounts, so people who do not follow a teen cannot see their content or tag, mention, or interact with them; blocks on search terms related to certain sensitive topics like suicide, self-harm, and eating disorders; and more. Teens under 16 cannot change any of these default settings without a parent's

permission. *See, e.g.*, *About Instagram Teen Accounts*, Instagram, https://perma.cc/5ZM8-RERT; *About Facebook Teen Accounts*, Facebook, https://perma.cc/69NR-ZAWK; *About Teen Accounts on Threads*, Instagram, https://perma.cc/8WPH-F2L3. Further, parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens and choose whether their teen sees a reminder to close the app or is blocked from using the app entirely once their daily time limit is reached; turn on sleep mode during select days and hours, and choose whether their teen sees a reminder to close the app or is blocked from using the app entirely during those days and times; view and change their teen's content settings; see the average amount of time their teen has spent on Facebook and Instagram over the last week (and the total time spent on Facebook and Instagram for each specific day over the last week); and more. *See, e.g.*, *Support your teen with supervision*, Meta, https://perma.cc/H26B-RUE9. And parents and guardians will soon be able to adjust their teen's default experience to require a non-personalized feed as their default feed on Facebook and Instagram (and teens will have this option as well).

53. Pinterest is running an experiment on reminders during the school day that remind minor users who "open[] the Pinterest app during the school day" to "put Pinterest down, pause notifications, and focus on school." *Resources for parents and caregivers of teens*, Pinterest, https://perma.cc/6BZF-2DS7.

54. TikTok provides parents with a suite of controls through its "Family Pairing" feature. Parents and guardians can link their TikTok account to their teen's account and, among other things, set customized daily screen-time limits (including different limits for different days); review a dashboard showing their teen's time on TikTok; use "Time Away" to block access during designated periods such as school hours, family time, or bedtime; control when push notifications are muted; filter keywords and hashtags from supported feeds; restrict search; control whether the

teen's account is private; manage direct messaging and who can comment on or otherwise interact with the teen's content; and block particular accounts. Family Pairing also gives parents visibility into certain aspects of their teen's activity, including accounts their teen follows, accounts following the teen, and blocked accounts. TikTok separately applies protections to teen accounts by default. Among other protections, accounts for users ages 13–15 are private by default and cannot send or receive direct messages; users under 18 receive a 60-minute daily screen-time limit by default; and TikTok disables push notifications overnight, beginning at 9 p.m. for users ages 13–15 and 10 p.m. for users ages 16–17.

55. X defaults known minors' accounts to "[p]rotected posts." *See Information for Parents and Minor Users*, X, https://perma.cc/4GEA-DHHM. "This means that known minors will receive a request when new people want to follow them (which they can approve or deny), that their posts will only be visible to their followers, and that their posts will only be searchable by them and their followers (i.e., they will not appear in public searches). Furthermore, once these accounts enter a date of birth that makes them under the age of 18, they will be stopped from re-entering a new date of birth." *Id.* X excludes from its recommender system "potentially harmful content." *Id.* Further, X "prohibit[s] users from promoting or encouraging suicide or self-harm," and if someone "searches for terms associated with suicide or self-harm, the top search result is a notification encouraging them to reach out for help." *Id.*

56. YouTube offers Supervised Teen Accounts, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. *The YouTube your kids and teens love, with the protections you want*, YouTube, https://perma.cc/S2KG-2W5F. YouTube has also developed features and

policies directed at promoting digital wellbeing among users. *Id.* YouTube also has a "Take a Break" feature that lets a user set a reminder to take a break while watching videos. *See Take a break reminder*, YouTube, https://perma.cc/UW4J-U6F7. This feature pauses the user's video until they dismiss it or resume playing the video and is defaulted on for minors but is available for all users.

57. In sum, NetChoice's members empower parents to make individualized decisions about their children's online experiences, consistent with their own judgments about their children's maturity, interests, and well-being. And they provide a wealth of tools for parents and minors to manage those experiences in the way that best suits them.

58. *Covered websites invest heavily in content moderation and beneficial user experiences.* NetChoice's members expend vast resources to curate the third-party speech disseminated on their websites to ensure that it is appropriate for the community of users they seek to foster. *See* Malena Dailey, By The Numbers: What Content Social Media Removes And Why 13 (2021), https://perma.cc/ZH55-XPQY. Covered services like "Facebook and YouTube" "cull and organize uploaded posts" to conform with their "content-moderation policies," which "lead [them] to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719–20. Other NetChoice member websites enforce similar policies. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *id.* at 735–36 (explaining that platforms' content-moderation policies identify when "removing a post is the right course," including for posts involving "hate speech, violent or graphic content, [and] child safety," such that platforms "exercis[e] authority to remove, label or demote messages they disfavor."). And just as they restrict some speech that does not meet community standards, many promote speech that does. That may

include content that encourages a healthy self-image, for example, or that promotes a positive mindset.

## III. New York SAFE for Kids Act

59. The Act was signed into law on June 20, 2024, and is currently set to take effect on January 25, 2027.

60. The Act's "Legislative intent" is clear: It is intended to redress the perceived harmful effects of "social media platforms." 2024 N.Y. Laws ch. 120, § 2. In service of that purported goal, the Act imposes onerous and content-based requirements on "covered operators" that fundamentally alter how NetChoice's members may operate their services with respect to all New York residents, adults and minors alike.

### A. Coverage

61. The Act's operative provisions apply to "covered operator[s]," "covered user[s]," and "covered minor[s]." *See* GBL §§ 1501, 1502.

62. A "covered operator" is defined as "any person, business, or other legal entity, who operates or provides an addictive social media platform." GBL § 1500(7).

63. An "addictive social media platform" in turn is "a website, online service, online application, or mobile application, that offers or provides users an addictive feed as a significant part of the services provided by such website, online service, online application, or mobile application." GBL § 1500(2).

64. By regulation, New York has defined "significant part" to mean that users spend at least twenty percent of time on the service viewing the "addictive" feeds as "measured over any one six-month period" measured in a calendar year. N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 13, § 700.1(d).

65. A so-called "addictive feed" is defined as "a website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users of a website, online service, online application, or mobile application, either concurrently or sequentially, are recommended, selected, or prioritized for display to a user based, in whole or in part, on information associated with the user or the user's device," except where:

> (a) the recommendation, prioritization, or selection is based on information that is not persistently associated with the user or user's device, and does not concern the user's previous interactions with media generated or shared by other users;
>
> (b) the recommendation, prioritization, or selection is based on user-selected privacy or accessibility settings, or technical information concerning the user's device;
>
> (c) the user expressly and unambiguously requested the specific media, media by the author, creator, or poster of media the user has subscribed to, or media shared by users to a page or group the user has subscribed to, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device that is not otherwise permissible under this subdivision;
>
> (d) the user expressly and unambiguously requested that specific media, media by a specified author, creator, or poster of media the user has subscribed to, or media shared by users to a page or group the user has subscribed to pursuant to paragraph (c) of this subdivision, be blocked, prioritized or deprioritized for display, provided that the media is not recommended, selected, or prioritized for display based, in whole or in part, on other information associated with the user or the user's device that is not otherwise permissible under this subdivision;
>
> (e) the media are direct and private communications;
>
> (f) the media are recommended, selected, or prioritized only in response to a specific search inquiry by the user;
>
> (g) the media recommended, selected, or prioritized for display is exclusively next in a pre-existing sequence from the same author, creator, poster, or source; or
>
> (h) the recommendation, prioritization, or selection is necessary to comply with the provisions of this article and any regulations promulgated pursuant to this article.

GBL § 1500(1)(a)-(h).

66. Notably, the Act's definition of "addictive feed" excludes media that "are direct and private communications." GBL § 1500(1)(e). Qualifying private messages therefore fall outside that definition, even when offered by a service that also provides a covered personalized feed. This distinction matters because *Moody* identified "curating a feed" and "transmitting direct messages" as activities that may involve different levels of editorial choice and therefore warrant different First Amendment treatment. 603 U.S. at 725–26.

67. The Act expressly preserves certain content-moderation decisions. Section 1501(7) provides that nothing in Section 1501 shall be construed as preventing "any action taken in good faith to restrict access to or availability of media" that operators consider "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." GBL § 1501(7).

68. The regulations exempt smaller platforms (less than five million monthly active users) or platforms with fewer than 20,000 monthly active users who are covered minors, except those that have minors as their "primary user base." 13 N.Y.C.R.R. § 700.1(q).

69. NetChoice has multiple members that satisfy both the statutory and regulatory criteria to be "covered operator[s]," including those members identified in ¶ 13.

70. Finally, a "covered user" is "a user of a website, online service, online application, or mobile application in New York, not acting as an operator, or agent or affiliate of the operator, of such website, online service, online application, or mobile application, or any portion thereof," and a "covered minor" is "a user of a website, online service, online application, or mobile application in New York when the operator has actual knowledge the user is a minor"—i.e., someone under the age of eighteen. GBL § 1500(3)–(4), (6).

**B. Default prohibition against providing personalized feeds, subject to age verification and parental consent**

71. Section 1501(1) conditions a covered operator's provision of a personalized feed on age determination or parental consent.

72. In so doing, the Act imposes a default prohibition on displaying personalized feeds to any New York user.[6]

73. Covered websites can provide personalized feeds only after determining that the user is not a covered minor or, if they are, obtaining verifiable parental consent.

74. *First*, to provide a personalized feed to any covered user, the operator must use "commercially reasonable and technically feasible methods to determine that the covered user is not a covered minor." GBL § 1501(1)(a). That requires covered websites to verify the ages of all users to display personalized feeds even to adults.

75. The regulations require that each method satisfy specified accuracy and circumvention-detection thresholds, and at least one method must satisfy the regulations' stricter "total accuracy" threshold. 13 N.Y.C.R.R. §§ 700.1(b), (gg), 700.4(b)(1). This accuracy threshold is more stringent the younger the minor. *Id.* § 700.1(gg). Covered services must also provide an appeals process and obtain third-party certification of compliance with these thresholds. *See id.* §§ 700.6 (appeals), 700.5 (certification).

76. Under those rules, a user may be treated as an adult if at least one compliant method returns an adult determination. If, however, all compliant methods are inconclusive, the service may presume the user is an adult unless it otherwise has actual knowledge that she or he is a minor.

---

[6] The Act also prohibits covered operators from "withhold[ing], degrad[ing], lower[ing] the quality, or increas[ing] the price of any product, service, or feature" for any covered user due to the "covered operator not being permitted to provide an addictive feed to such covered user." GBL § 1504.

Although the statute requires actual knowledge, the rules provide that knowledge can arise from self-declaration, age-assurance results, certain user data, or other reliable evidence, whether or not the company has actually analyzed that data. *Id.* § 700.4(a)–(b).

77. Covered services must attempt to prevent circumvention of age-assurance methods: “submission of false data or interference with an age assurance method.” *Id.* § 700.1(w). It is not clear whether this extends to preventing users from employing virtual private networks (“VPNs”) to access the service.

78. *Second*, to provide a personalized feed to a covered minor, the operator must obtain “verifiable parental consent.” GBL § 1501(1)(b).

79. To obtain that consent, the regulations require that the service must first “obtain valid consent from the covered minor to request verifiable parental consent.” 13 N.Y.C.R.R. § 700.2(e)(1)(b).

80. For parental consent to be “verifiable,” services must (1) satisfy requirements governing the content of the messages to parents and (2) verify the parent-child relationship. Specifically, the notice must identify the service and minor account and explain, in plain language, that New York law requires parental consent for a personalized feed, that the minor can use a non-personalized feed while consent is pending, and that consent may be modified or withdrawn. *Id.* § 700.2(e)(4). Services must provide that information to parents in at least 12 different languages. GBL § 1506. The parental-consent method must also verify the parent’s adult status, be reasonably calculated to confirm the parent-child relationship and address circumvention or fraud, protect privacy and safety, and include options that do not require government identification, a parent account, or a purchase. 13 N.Y.C.R.R. § 700.2(e)(5).

**C. Prohibition against providing notifications regarding personalized feeds to minors at certain hours**

81. The Act separately prohibits any covered operator from, "between the hours of 12 AM Eastern and 6 AM Eastern, send[ing] notifications concerning an addictive feed to a covered minor unless the operator has obtained verifiable parental consent to send such nighttime notifications." GBL § 1502.

82. That prohibition is plainly content-based: if a notification is "concerning" a personalized feed, the Act applies. If it is not, the Act does not.

**D. Defendant Attorney General's regulatory and enforcement authority**

83. The Act directs the Attorney General to promulgate implementing regulations. GBL §§ 1501(2), (4), 1505.

84. The Act also assigns enforcement authority to the Attorney General, who may seek relief when "any person, within or outside the state, has engaged in or is about to engage in any of the acts or practices stated to be unlawful in the [Act]." GBL § 1508(1). That relief may include injunctive relief, restitution, disgorgement of profits, damages, and civil penalties up to $5,000 per violation. *Id.*

## CLAIMS

85. For its First Amendment claims, Plaintiff raises both (1) a facial challenge to the Act; and (2) an as-applied challenge to the Act "to the extent" it regulates the NetChoice covered members and services identified in ¶ 13. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).[7]

---

[7] On October 26, 2026, NetChoice sent a letter to the Office of the New York Attorney General challenging the regulations promulgated under the Act as exceeding statutory authority and arbitrary and capricious. Depending on the Attorney General's response to that letter, NetChoice may amend to articulate constitutional and Section 230 challenges to the regulations promulgated. NetChoice reserves all rights.

**<u>COUNT I</u>**
**42 U.S.C. § 1983**
**FIRST AMENDMENT, AS INCORPORATED BY THE FOURTEENTH AMENDMENT**
**(PUBLISHING RESTRICTIONS AND MANDATES—GBL §§ 1501–1502)**
**(FACIAL AND AS-APPLIED CHALLENGES)**

86. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

87. The Act's prohibitions and restrictions on personalized feeds and notifications violate the First Amendment, both facially and as applied to NetChoice's covered members, including those identified in ¶ 13.

88. As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I.

89. Among other things, the First Amendment protects against government interference with or control of "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1.

90. All of these rights apply to the "staggering amount" of protected speech, across "billions" of posts, that "social-media platforms," including NetChoice member services, facilitate and disseminate. *Moody*, 603 U.S. at 716–19, 725, 737, 744 (discussing NetChoice member services like "Facebook" and "YouTube"). The Supreme Court has had no difficulty concluding that such services allow people to "engage in a wide array of … activity on topics 'as diverse as human thought'"—all "protected [by the] First Amendment." *Packingham*, 582 U.S. at 105.(citing *Reno*, 521 U.S. at 870).

91. Facial relief is appropriate because the Act's unconstitutional applications are substantial in relation to any plainly legitimate sweep. *Moody*, 603 U.S. at 723–24. Unlike in *Moody*, there is no genuine question here about what the Act regulates or how it restricts expressive

activity. The Act's operative provisions reach a single activity: the selection, organization, and presentation of media "generated or shared by users" through personalized feeds, and notifications concerning those feeds. GBL §§ 1500(1), 1501, 1502. Because that activity is "expressive activity of its own," *Moody*, 603 U.S. at 731, the Act burdens protected expression in the substantial majority of its applications. And because the Act is content-based, it is subject to strict scrutiny in all of its applications—even if the Act reaches a minuscule amount of unprotected speech. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also, e.g.*, *Doe v. Prosecutor, Marion Cty., Indiana*, 705 F.3d 694, 699 (7th Cir. 2013). At a minimum, the Act is unconstitutional as applied to NetChoice's covered members and their services. *See John Doe No. 1*, 561 U.S. at 194.

92. **The Act's speech restrictions implicate the First Amendment.** The Act's default prohibition on personalized feeds, age-determination requirement, parental consent requirement, and notification restrictions all implicate the First Amendment. Section 1501 restricts covered services' selection, organization, and presentation of third-party speech through personalized feeds, while Section 1502 restricts their dissemination of notifications concerning those feeds. Both provisions also burden users' ability to receive and engage in constitutionally protected speech.

93. *Default prohibition on personalized feeds.* By prohibiting the presentation of personalized feeds by default, Section 1501 burdens platforms' expressive choices about what content to present and how to present it.

94. Social media services "engage[] in expression" by "curating their feeds" to provide a "distinctive expressive offering" of third party speech, in which the "key" is "prioritization of content, achieved through the use of algorithms … most often based on a user's expressed interests and past activities." *Moody*, 603 U.S. at 716–17, 734–38. And as the Supreme Court has

recognized, those social media services have a First Amendment right to publish, organize, and disseminate protected speech free from governmental restraint and compulsion. *See id*. at 738–43.

95. As the Supreme Court recognized in *Moody*, social media services "are indeed engaged in expression" when they curate third-party content. *Id*. at 716. Like traditional publishers and editors, they "select and shape other parties' expression into their own curated speech products." *Id.* at 717. And that, the Supreme Court explained, is expressive activity protected by the First Amendment. *Id.* Those expressive choices also extend to editorial choices about how to use information from users to present more interesting and relevant content to them—because "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (citation omitted).

96. Section 1501's restriction on personalized feeds directly and unconstitutionally burdens covered platforms' First Amendment rights by interfering with their choices about how to "combin[e] 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 738 (citation omitted); *see also Wash. Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (recognizing that the First Amendment provides "independent constitutional protection" over "the very 'choice of material to go into a [compilation]'") (citation omitted). "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 603 U.S. at 731.

97. That the platforms' curation accounts in part for what users may find interesting does not strip it of protection. The *Moody* majority recognized that Facebook's feed receives First Amendment protection even though its "selection and ranking is most often based on a user's expressed interests and past activities," 603 U.S. at 734–35, and made clear that a "narrow,

succinctly articulable message is not a condition of constitutional protection." *Id.* at 732 (quoting *Hurley*, 515 U.S. at 569). Publishers have long tailored content to their audiences without conceding constitutional protections, *see Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), and personalized information "allows [speakers] to shape their messages" to their audience—itself a constitutionally protected endeavor, *Sorrell*, 564 U.S. at 578. And because *Moody* protects the feed as a whole, 603 U.S. at 739–40, the processes used to compile it cannot be disaggregated from the expressive product for purposes of the constitutional analysis.

98. Independently, Section 1501 burdens covered services' right to disseminate protected third-party speech. "[D]issemination of information [is] speech within the meaning of the First Amendment," *Sorrell*, 564 U.S. at 570, and the "right of freedom of speech … embraces the right to distribute" it, *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (citation omitted); *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). That users might locate the same speech by other means does not cure the burden: there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976). "[F]or fully protected speech, 'the distinction between bans and burdens makes no difference to the level of scrutiny.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 493 n.12 (2025) ("*FSC*") (citation omitted).

99. *Age-determination requirement.* "[S]ubmitting to age verification" to access protected speech is a burden on First Amendment rights. *Id.* at 483.

100. As courts have repeatedly recognized, age-tiered speech restrictions and proof-of-age mandates chill lawful expression and increase burdens on access. *See supra* note 2. Courts addressing analogous age-determination requirements as part of State minor-protection regimes

have thus found that such requirements burden access to protected speech for adults and minors alike. *See, e.g.*, *Murrill*, 812 F. Supp. 3d at 664 (permanently enjoining age-verification requirement); *Griffin I*, 2025 WL 978607, at *13–14 (deeming age-authentication requirements burdens that trigger First Amendment scrutiny); *Reyes*, 748 F. Supp. 3d at 1120–21 (preliminarily enjoining age-assurance system as part of an Act that could not satisfy strict scrutiny). A requirement to prove one's age to access brick-and-mortar libraries and bookstores would raise serious First Amendment concerns, and the First Amendment applies the same way to online services. *Moody*, 603 U.S. at 719 (First Amendment principles "do[] not go on leave when social media are involved").

101. The age-determination requirement in Section 1501, GBL § 1501(1)(a), (2), imposes burdens on all users, adults and minors alike, and their ability to access and participate in protected speech across all covered platforms. All users will have to submit to state-selected processes "to determine if a covered user is a covered minor." GBL § 1501(2)(a).

102. The age-determination requirement burdens adults' ability to access and engage in protected speech anonymously. Adults may wish to explore political, religious, medical, or other sensitive subjects without linking their identities to those interests. The First Amendment protects the decision to speak anonymously, including when motivated by concerns about retaliation, social ostracism, or privacy. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995) ("[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."). And the Second Circuit has recognized that age-verification systems can require website visitors to "forgo the anonymity otherwise available on the internet," deterring adults from accessing protected expression. *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d

Cir. 2003) (restriction on Internet speech unconstitutional as applied where age-verification measures would deter adult access and less restrictive alternatives could substantially achieve the state's goals). Requiring adults to provide additional personal information to a covered service or an age-assurance provider as a condition of receiving personalized feeds burdens that protected activity, even if users may continue to display a pseudonym to other users.

103. Some adults will abandon the verification process rather than complete additional steps to receive protected speech through a personalized feed. Indeed, New York's own cost analysis suggests that its restrictions may deter 25% of users who reach the age-determination appeals process from completing that process to access fully protected speech. *See* N.Y. State Off. of the Att'y Gen., SAFE for Kids Act Notice of Proposed Rulemaking 120 n.164, https://perma.cc/K2X3-3UUU.

104. Nor can age-assurance methods reliably classify every user. *See* 13 N.Y.C.R.R. §§ 700.1(r) (defining a "false negative" as "incorrectly identifying an adult as a minor"), 700.5(b)(3) (requiring testing of false-negative rates for adults ages eighteen through thirty). An adult may be incorrectly classified as a minor and required to pursue an appeal or another verification method before receiving a personalized feed. *See id.* § 700.6(a). The regulations' accuracy thresholds and appeals requirements do not eliminate the intervening burden on that adult's access to protected speech. *See id.* § 700.6(c) (allowing operators ten business days to decide an appeal or request additional information). And although the regulations permit an adult presumption in specified circumstances when all compliant methods are inconclusive, that presumption does not eliminate the obligation to undergo the required process or resolve an affirmative but erroneous determination that an adult is a minor. *See id.* § 700.4(b)(1)(ii).

105. Those burdens are particularly significant for adults who lack ready access to identification documents, financial records, or other information used by an available age-assurance method. Other adults may be unwilling to submit identifying information or images because of concerns about privacy, security, or disclosure of their online activities. Offering alternative methods does not eliminate those burdens when the alternatives require information, technology, or disclosures that a particular user cannot readily provide, does not have access to, or is unwilling to make.

106. *Parental-consent requirement.* A related but distinct and independently significant constitutional defect is that the Act makes verifiable parental consent a precondition to a minor's receipt of protected speech through personalized feeds. By restricting that access, the Act also limits opportunities for minors to discover and respond to others' expression and participate in conversations they would otherwise encounter. It thus burdens the First Amendment rights of both the social media services and users determined to be under eighteen. The First Amendment limits the State's authority to condition minors' access to protected speech on covered services upon parental pre-approval, particularly where, as here, that condition is imposed through a content-based and speaker-based statute. Although the State perhaps "has the power to *enforce* parental prohibitions," it does not follow that it "has the power to prevent children from hearing or saying anything *without their parents' prior consent*" without confronting the First Amendment. *Brown*, 564 U.S. at 795 n.3 (emphasis in original ).

107. The "values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 213. Thus, "[e]ven

where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804–05; *see id.* at 795 n.3.

108. Section 1501(1) prohibits any covered operator that has not "used commercially reasonable and technically feasible methods to determine that the covered user is not a covered minor" from providing a covered user a personalized feed absent "verifiable parental consent." GBL § 1501(1). Thus, a covered minor cannot receive a personalized feed if her parent declines, is unavailable, or withholds consent for reasons unrelated to the minor's welfare. A personalized feed may introduce a minor to political commentary she wishes to answer, creative work she wishes to discuss, or a community whose conversations she wishes to join. By limiting those opportunities for discovery, the Act also limits opportunities for the minor to respond, contribute, and engage in protected expression herself.

109. The practical operation of the parental-consent requirement compounds those burdens. Verifying that a person is an adult does not establish that the person has authority to consent for a particular minor. As the state's own expert acknowledged in *Griffin*, a central difficulty is "actually establishing … the parental relationship." *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *4, *15 (W.D. Ark. Aug. 31, 2023). Those difficulties can be even greater when parents and children have different last names or addresses; parents are divorced, separated, or disagree about consent; children are adopted or in foster care; parental rights have been terminated; or minors are emancipated or live with relatives or other caregivers. Establishing who may consent, and documenting that authority, may require sensitive information about custody, adoption, or other family circumstances. The regulations' requirement that services verify the parent-child relationship does not eliminate these practical obstacles. *See* 13 N.Y.C.R.R. § 700.2(e)(5).

110. Faced with potential liability for accepting invalid consent, covered services have incentives to require additional proof when a caregiver's authority cannot readily be established. Those demands can delay or prevent access even when a person authorized to consent wishes to do so. *Griffin* recognized that cautious verification practices can discourage otherwise willing parents and unnecessarily burden minors' access to protected speech. 2023 WL 5660155, at *15. For minors living in abusive or otherwise unsafe homes, seeking parental consent may itself create risks by requiring them to disclose the service through which they wish to find information, support, or community. Other minors may have no parent or guardian readily available to complete the required process. The resulting barriers restrict access based on family circumstances that bear no necessary relationship to the value or suitability of the speech.

111. Those burdens are not confined to the "relatively narrow and well-defined circumstances" in which the State may restrict minors' access to speech—circumstances involving statutes scoped to speech that is unprotected as to minors, like obscenity. *Erznoznik*, 422 U.S. at 212–13. Section 1501 is not so limited: it conditions minors' access to a vast range of fully protected speech on covered services upon parental approval, without regard to its content.

112. *Notifications restriction.* Section 1502 independently burdens protected expression by prohibiting covered operators, absent verifiable parental consent, from sending covered minors notifications concerning an "addictive feed" between midnight and 6 a.m. Eastern. That prohibition restricts the services' protected expressive activity based on the notifications' content and burdens users' receipt of that speech. *Bonta I* held that "notifications are expressive" and preliminarily enjoined a similar provision, a ruling the state did not appeal. 761 F. Supp. 3d at 1224, 1227.

113. **The Act's speech restrictions trigger strict First Amendment scrutiny.** The Act's coverage definition and operative scope are content-based, subjecting Sections 1501 and 1502—and, because they are not severable, the entire Act—to strict scrutiny, for multiple reasons.

114. "Consistent with the First Amendment's jealous protections for the individual's right to think and speak freely," the Supreme Court has "long held that laws regulating speech based on its subject matter or 'communicative content' are 'presumptively unconstitutional.'" *Chiles v. Salazar*, 607 U.S. 627, 640–41 (2026) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *Brown*, 564 U.S. at 790–91 (noting that the First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content").

115. A law "is facially content based … if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citing *Reed*, 576 U.S. at 163). Laws are also content-based if they "cannot be justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164 (cleaned up). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *City of Austin*, 596 U.S. at 74. Accordingly, where the "overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the regulation "is not 'justified without reference to the content of the regulated speech.'" *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811–12 (2000) (cleaned up).

116. A good proxy for determining whether a law is content based is whether the speaker can avoid or mitigate the effects of the law by altering the substance of her or his expression—if so, the law is likely content based. *TikTok, Inc. v. Garland*, 604 U.S. 56, 70–71 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) (plurality opinion)).

117. Here, the Act is content-based for at least five reasons.

118. *First*, "a law that dictates how to curate or compile others' speech is generally a content-based regulation subject to strict scrutiny." *Volokh v. James*, 148 F.4th 71, 84 (2d Cir. 2025). That is precisely what the Act does. It precludes services from providing personalized feeds—that is, from curating and compiling third-party speech as they will—absent age determination and parental consent. Relatedly, what speech a social media service could promote to any user would depend on content, because Section 1501 regulates whether content may be "recommended, selected, or prioritized for display to a user based, in whole or in part, on information associated with the user or the user's device." GBL §§ 1500(1), 1501(1). There is no restriction on promoting other content.

119. *Second*, the definition of "addictive feed" reaches only "media generated or shared by users," GBL § 1500(1), leaving untouched identical recommendations of media produced or licensed by the operator itself. It does not apply to personalized content provided by the New York Times, Fox News, Disney+, or Netflix, and a service can avoid the restriction by changing what speech it includes in its personalized compilation—replacing users' speech with its own or off-platform speech. Preferring operator-selected content over user-generated content is both impermissible content discrimination and a speaker preference that "reflects a content preference." *Turner*, 512 U.S. at 658; *see Jones*, 822 F. Supp. 3d at 673 ("Virginia chose to regulate user-generated content, but not provider-selected content, because it concluded that user-generated content is more harmful. … This is precisely the type of speaker preference the Supreme Court declared should be treated as content-based.") (citation omitted).

120. *Third*, the Act singles out "social media platforms" as opposed to other purveyors of speech on the Internet or elsewhere, and thus is content-based. 2024 N.Y. Laws ch. 120, § 2;

GBL §§ 1500(2), 1501(2), 1502, 1507. Courts are deeply skeptical of laws that "distinguish[] among different speakers," because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). That principle has particular force when a law singles out some, but not all, of those in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230–31 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). The State thus privileges one editorial assessment of that speech over another, a preference that independently subjects the Act to strict scrutiny. *See Reed*, 576 U.S. at 164 (facially neutral laws "will be considered content-based" when enacted "because of disagreement with the message [the speech] conveys"); *Sorrell*, 564 U.S. at 565–66 ("Given the legislature's expressed statement of purpose, it is apparent that § 4631(d) imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint.").

121. *Fourth*, Section 1502 is independently content-based on its face: whether a notification may be sent turns on whether it is "concerning" a personalized feed. GBL § 1502. A covered operator may send a minor a nighttime notification about an account-security issue or a direct message, but not one alerting her to new content in her personalized feed. Because the application of the statute depends on the message expressed in the notification, strict scrutiny applies to Section 1502 as well. *Reed*, 576 U.S. at 163–64.

122. *Fifth*, the Act's stated purpose confirms that strict scrutiny is appropriate. The title of the Act and uncodified Section 2 of the session law, 2024 N.Y. Laws ch. 120, § 2 ("Legislative intent"), let the proverbial cat out of the bag: the supposedly "addictive" nature of personalized feeds is the very problem the State wishes to address. Because a feed of content is interesting and engaging by virtue of its content, the State's rationale turns on users' reactions to the speech

presented to them, not an effect unrelated to its communicative content. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (laws targeting the effect of speech on the listener are subject to strict scrutiny). A law that restricts access to speech because the listener finds it too engaging targets protected expression for the very feature the First Amendment exists to protect: the capacity of speech to capture and hold the mind. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought."). Accordingly, the State may not burden "a form of protected expression that it f[inds] too persuasive." *Sorrell*, 564 U.S. at 575–76, 580 ("[T]he fear that speech might persuade provides no lawful basis for quieting it.").

123. For each of these reasons, strict scrutiny applies to the Act. *Reed*, 576 U.S. at 164. Nor, for that matter, can the State rely on content-neutral justifications "invented post hoc in response to litigation" to escape strict scrutiny. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022).

124. **The Act's speech restrictions fail any level of heightened First Amendment scrutiny.** Where, as here, a law is subject to strict scrutiny, "the state bears the burden of showing that the restriction on speech is 'justified by a compelling government interest and is narrowly drawn to serve that interest.'" *Volokh*, 148 F.4th at 84 (quoting *Brown*, 564 U.S. at 799). To satisfy this burden, "[t]he State must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Id.* "It is rare that a regulation restricting speech because of its content will ever be permissible." *Brown*, 564 U.S. at 799.

125. Alternatively, intermediate scrutiny would require the State to establish: (1) the law advances an "important or substantial governmental interest … *unrelated to the suppression of*

*free expression*"; (2) the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"; and (3) the means chosen are reasonably tailored in the sense that they do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner*, 512 U.S. at 662 (emphasis added).

126. For both strict and intermediate scrutiny, the State "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (quoting *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014) (plurality opinion)) (cleaned up). And in both scenarios, the government's "burdens" on speech "must satisfy the same rigorous scrutiny" as the government's "bans." *Sorrell*, 564 U.S. at 566 (citation omitted).

127. The Act cannot survive any form of heightened First Amendment scrutiny because (1) the State's interest is not unrelated to suppressing speech; (2) the Act is not necessary to address any legitimate interest or problem the State might identify; and (3) the Act is both overbroad and underinclusive and thus fails any tailoring analysis.

128. *The State's interest is related to the suppression of speech and thus constitutionally impermissible.* To survive any form of First Amendment review, an asserted governmental interest must be "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 471 (citation omitted) (cleaned up). That is true whether the interest is based on a concern that the speech in question is not suitable for a particular audience—or that it is too suitable, and thus too appealing. "Speech … cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14. "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578. The Act's asserted interest—shielding teenagers from the purported effects of personalized

feeds of user-generated speech—is an interest in that speech's communicative impact. The burden on speech is intended, not incidental, and accordingly fails any form of First Amendment scrutiny.

129. *The Act is not necessary to address any legitimate interest.* New York cannot demonstrate that the restrictions will materially "further [the State's asserted] interests," *FSC*, 606 U.S. at 471, much less that it will do so "in a direct and material way." *Turner*, 512 U.S. at 664.

130. The State has not "specifically identif[ied]" how the Act's scope responds to "an 'actual problem' in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up); *see Eclipse Enters., Inc. v. Gulotta*, 134 F.3d 63, 67–68 (2d Cir. 1997) (invalidating restriction on sales of crime-themed trading cards to minors despite a conceded compelling interest in their psychological well-being, and concluding the record lacked "substantial supporting evidence" to justify the restriction). Research that "is based on correlation, not evidence of causation" does not suffice, *Brown*, 564 U.S. at 800, but the State relies only on claims of what is, at best, loose correlation that discusses social media generally, not personalized feeds or notifications specifically, to justify the Act. *See* N.Y. State Senate Introducer's Mem. in Support, S. 7694-A, 2023–2024 Leg., Reg. Sess. (N.Y. 2024), https://perma.cc/9RJ3-MBNZ.

131. Nor can the State justify why the Legislature disregarded the many viable, less intrusive alternatives available to parents, such as "incentivizing companies to offer voluntary content filters or application blockers," encouraging parents and users to employ them, and "educating children and parents" on the State's views about social media usage. *Bonta*, 113 F.4th at 1121. Parents have a wealth of less restrictive means to oversee their minor children online, including voluntary tools and controls through which many NetChoice members already provide parents with the ability to supervise their minors' online activity, set reminders, and impose time limits, nighttime restrictions, and content controls, among other things. Those choices provide

families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls as less restrictive means over governmental interventions that would impose state-created barriers to accessing lawful speech. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Playboy*, 529 U.S. at 825–26. New York cannot demonstrate that the wide range of device-level, network-level, browser-level, and service-level parental controls already available to New York parents is inadequate to address the harms the Act invokes. Even under intermediate scrutiny, the State cannot rely on "speculation or conjecture," but must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests[.]" *Cornelio v. Connecticut*, 32 F.4th 160, 171–72 (2d Cir. 2022) (citations omitted).

132. *The Act is not properly tailored.* The Act burdens substantially more speech than necessary to further important governmental interests by mandating a particular set of editorial choices. That government-mandated alternative is *less* useful. It will materially decrease the diversity of ideas because where services disseminate user-generated speech at scale, they need a mechanism to pair speakers and audiences quickly. Absent such a mechanism, speakers cannot find the right listeners and listeners cannot find the right speakers. The result risks a regression to a system where the benefits of crowd-sourced speech are lost, and the decisions about which ideas get elevated are increasingly made by a small number of established media outlets.

133. The Act's blanket prohibitions are also vastly overbroad because they prohibit beneficial speech. *See Brown*, 564 U.S. at 795 n.3 (recognizing minors' rights "to speak or be spoken to"). A teenager could not get, for example: (1) personalized content that is *more* safe or appropriate for that particular minor; (2) a "marked safe" Facebook notification from a family

member after midnight during a wildfire or earthquake; or (3) a notification that a school has posted about vacations, snow days, or time-off periods.

134. The Act is also underinclusive. *Brown*, 564 U.S. at 802; *see Bonta I*, 761 F. Supp. 3d at 1227 (finding the notification provisions "extremely underinclusive" and thus not "properly tailored"). If personalized feeds were as harmful as the State asserts, there would be no basis for permitting them "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802; *see* GBL § 1501(1)(b). The Act likewise leaves untouched identical personalized recommendations of operator-produced content, GBL § 1500(1), and leaves minors free to spend unlimited time online, including on covered services. Such exceptions reveal that the Act is not tailored to its asserted interests.

135. Sections 1501 and 1502 thus fail strict or even intermediate scrutiny.

136. Unless declared invalid and enjoined, these restrictions will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its covered members, and Internet users.

## COUNT II
## PREEMPTION UNDER 47 U.S.C. § 230
## DECLARATORY AND INJUNCTIVE RELIEF UNDER
## 42 U.S.C. § 1983 AND *EX PARTE YOUNG*
## (PUBLISHING RESTRICTIONS AND MANDATES—GBL §§ 1501–1502)

137. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

138. Section 230 preempts the Act's restrictions on personalized feeds and notifications, both facially and as applied to NetChoice's covered members, including those identified in ¶ 13.

139. Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That includes penalizing actions to "(A) filter, screen, allow, or disallow … ; (B) pick, choose, analyze, or digest … ; or (C) transmit, receive, display,

forward, cache, search, subset, organize, reorganize, or translate content" created by third parties. *Id.* § 230(f)(4).

140. Congress expressly preempted "inconsistent" state law, providing that no "cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). *E.g.*, *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1175–77 (9th Cir. 2024) ("Section 230 expressly preempts any state laws with which it may conflict." (citation omitted)).

141. Section 230(c)(1) shields a defendant from civil liability when: (1) it is a "provider or user of an interactive computer service," as defined by § 230(f)(2); (2) the plaintiff's claims "treat[]" the defendant as the "publisher or speaker" of information; and (3) that information is "provided by" an "information content provider," as defined by § 230(f)(3), other than the defendant. 47 U.S.C. § 230(c)(1); *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019). NetChoice members satisfy each of these prongs.

142. *First*, NetChoice members operate "interactive computer service[s]." 47 U.S.C. § 230(c)(1), (f)(2). Indeed, the Act applies only to interactive services that publish "pieces of media generated or shared by users." GBL § 1500(1).

143. *Second*, in personalizing such third-party content and providing notifications about such content, covered NetChoice members engage in protected publishing activity under Section 230. *See FTC v. LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016).

144. Whether a law treats a service as a publisher turns on whether the duty it imposes derives from the service's status or conduct as a publisher of third-party content. *Id.* at 175. Section 230 protects websites' "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" generated by third parties. *Id.* at 174

(citations omitted) (cleaned up); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (same). Publishing functions protected by Section 230 include a website's arrangement and distribution of third-party content, including through personalized-recommendation algorithms that match content with users' interests. *Force*, 934 F.3d at 66–67*; LeadClick*, 838 F.3d at 174 (recognizing protection for a publisher's "traditional editorial functions"); *see also Pinckney*, 127 F.4th at 521, 525–26 (Section 230 preempts state laws that seek to dictate "whether and how to display certain information provided by third parties," including "the manner in which [a provider] sorts, arranges, [or] distributes third-party content"—such as by imposing liability on "design choice[s]" or "design and architecture" that "are inextricably intertwined with [the website's] role as a publisher of third-party content"); *Doe v. Grindr, Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) (Section 230 applies if "the challenged features of [an online platform] are not independent of [its] role as a facilitator and publisher of third-party content"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256–57 (4th Cir. 2009) (Section 230 protects a website's "structure and design").

145. As the Second Circuit has explained, "arranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media. *That is an essential result of publishing*." *Force*, 934 F.3d at 66 (emphasis added). Accordingly, Section 230 applies: "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific edit[orial] or selection process." *Id.* at 67 (citation omitted) (cleaned up); *Meta Platforms*, 174 F.4th at 1167–70 (the "promotion of engagement-driven content through" a "personalized algorithm" is "publishing conduct" protected

by Section 230). For these reasons, the Act here would treat NetChoice's covered members "as [a] publisher." 47 U.S.C. § 230(c)(1).

146. *Third*, NetChoice members disseminate "information provided by another information content provider," *id.* § 230(c)(1), (f)(3), namely, billions of posts of third-party content, *Moody*, 603 U.S. at 734. Specifically, NetChoice members disseminate third-party content that is created and developed exclusively by users in extraordinary quantities.

147. Therefore, the Act's restrictions on personalized-recommendation algorithms are preempted.

148. Similarly, Section 230 also preempts the Act's restrictions on notifications. These regulations likewise regulate "notifications," which are "tools" that "facilitate the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (Section 230 protects websites' decisions to provide "notifications" about third-party content). By prohibiting overnight notifications concerning personalized feeds absent parental consent, the Act dictates when covered services may distribute those notifications, requiring them to "postpone" publication—a traditional editorial function protected by Section 230. *LeadClick*, 838 F.3d at 174; *see also In re Soc. Media Litig.*, 702 F. Supp. 3d 809, 833 (N.D. Cal. 2023) ("[W]here notifications are made to alert users to third-party content, Section 230 [applies]"); *Doe 1 v. Twitter*, 148 F.4th at 646 ("[T]o hold internet content providers liable for developing 'content-neutral tools used to facilitate [users'] communications'" would "swallow[] up every bit of the immunity that the section otherwise provides.") (citations omitted).

149. Unless declared preempted, the Act's regulation of online services will cause Plaintiff, its members, and Internet users irreparable harm and violate federal law.

**COUNT III**
**EQUITABLE RELIEF**

150. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

151. The entire Act and individually challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong*, 575 U.S. at 326–27 (citations omitted).

152. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

**COUNT IV**
**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

153. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

154. GBL §§ 1501 and 1502 violate the First Amendment, as incorporated by the Fourteenth Amendment, and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

155. GBL §§ 1501 and 1502 are unlawful and unenforceable, together and separately, because Section 230 preempts them and/or they violate the First Amendment of the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

156. The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

157. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

158. This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

159. This Court can and should exercise its equitable power to enter a declaration that GBL §§ 1501 and 1502 are unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that proper process issue and be served upon Defendant, requiring Defendant to answer the Complaint within the time prescribed by law, and that the Court enter an order and judgment:

- Declaring that GBL §§ 1501 and 1502, and any provisions of the Act not severable from them, violate the First Amendment to the United States Constitution, as incorporated through the Due Process Clause of the Fourteenth Amendment, on their face and as applied to Plaintiff's members;
- Declaring that GBL §§ 1501 and 1502 are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230;
- Preliminarily and permanently enjoining Defendant, successors in office, and all persons acting in active concert or participation with them, or subject to their supervision, direction, or control, from enforcing GBL §§ 1501 and 1502, and any implementing regulations, against Plaintiff's members;
- Waiving any requirement that Plaintiff post security or a bond in connection with preliminary or permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65(c);
- Entering judgment in favor of Plaintiff and against Defendant;

- Awarding Plaintiff its reasonable attorneys' fees and costs, including pursuant to 42 U.S.C. § 1988(b); and
- Awarding such other relief as the Court deems just and proper.

Dated: November 23, 2026

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ *Jeffrey P. Metzler*
Jeffrey P. Metzler

JEFFREY P. METZLER (SDNY Bar # JM7025)
31 West 52nd Street
New York, NY 10019
Telephone: 212.858.1153
Facsimile: 212.858.1500
jeffrey.metzler@pillsburylaw.com

ANNE M. VOIGTS (*pro hac vice* forthcoming)
2400 Hanover Street
Palo Alto, CA 94304
Telephone: 650.233.4075
Facsimile: 650.233.4545
anne.voigts@pillsburylaw.com

DEBORAH B. BAUM (*pro hac vice* forthcoming)
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone: 202.663.8772
Facsimile: 202.663.8007
deborah.baum@pillsburylaw.com

*Attorneys for Plaintiff NetChoice*